REVISED July 17, 2018

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 15, 2018

Lyle W. Cayce
Clerk

No. 18-50484

WHOLE WOMAN'S HEALTH; BROOKSIDE WOMEN'S MEDICAL
CENTER, P.A., doing business as Brookside Women's Health Center and
Austin Women's Health Center; LENDOL L. DAVIS, M.D.; ALAMO CITY
SURGERY CENTER, P.L.L.C., doing business as Alamo Women's
Reproductive Services; WHOLE WOMAN'S HEALTH ALLIANCE;
DR. BHAVIK KHUMAR,

    Plaintiffs - Appellees

v.

CHARLES SMITH, Executive Commissioner of the Texas Health and Human
Services Commission, in his official capacity,

    Defendant - Appellee

v.

TEXAS CATHOLIC CONFERENCE,

    Movant - Appellant

Appeal from the United States District Court
for the Western District of Texas

Before JONES, COSTA, and HO, Circuit Judges.

EDITH H. JONES, Circuit Judge:

No. 18-50484

This is an emergency appeal from an extraordinary discovery order by the district court to a religious body. The court compelled document production of the group's internal communications despite its status as a non-litigant and its voluntary furnishing of substantial discovery materials. Because the trial date looms, and with the benefit of full briefing from both parties, we elect to consolidate the Appellant's motion to stay, along with the Appellees' motion to dismiss this appeal, with a determination of the merits of the discovery order. We REVERSE the court's order denying the Appellant's motion to quash and compelling further document discovery.

## BACKGROUND

The Texas Conference of Catholic Bishops ("TCCB") is an unincorporated ecclesiastical association that furthers the religious ministry of the Roman Catholic Bishops and Archbishops in the State of Texas. Catholic Bishops communicate through TCCB to determine how the Catholic Church should address various moral, theological, and social issues, including abortion policy. The Catechism of the Catholic Church teaches that the dignity of all human life demands respect and that abortion is gravely sinful. *See* Catechism of the Catholic Church §§ 2270-75.

In August 2016, Jennifer Allmon, TCCB's Executive Director, voluntarily testified in administrative proceedings in favor of amending state regulations regarding the disposal of embryonic and fetal tissue. Proposed by the Texas Department of State Health Services ("DSHS"), the new regulations would prohibit disposing of fetal remains in a landfill or sewer, as had been earlier allowed. *See* 41 Tex. Reg. 9709-41 (2016). Ms. Allmon's written and oral testimony communicated the Bishops' conviction that fetal remains should be disposed of with respect.

Because a primary objection to the new regulations was the increased cost of interment, the Bishops considered facilitating free burials for fetal

No. 18-50484

remains.[1]  On December 12, 2016, TCCB announced that it would work with Catholic cemeteries and funeral homes throughout Texas to offer free common burial[2] services to fetal remains produced as a result of abortions.

In late 2016, the plaintiffs—several Texas health care providers licensed to perform abortions in the state—challenged the fetal remains regulations pursuant to 42 U.S.C. § 1983.  The plaintiffs alleged, *inter alia*, that the costs imposed by the regulations would violate Due Process by burdening the rights of women seeking an abortion.  The plaintiffs sought a temporary restraining order and preliminary injunction.  The district court granted the temporary restraining order on December 15, 2016 and scheduled a hearing on the preliminary injunction.

The plaintiffs argued, in part, that the fetal remains amendments would "make[] the availability of abortion services contingent on the ability and willingness of third-party vendors to bury or scatter the ashes of embryonic or fetal tissue at a non-prohibitive cost. . . . These options are prohibitively expensive."  In response, the State of Texas cited Ms. Allmon's testimony as evidence that a "non-profit group is prepared to provide for the burial of fetal tissue from all health-care providers across the state without charge."

Ms. Allmon testified at the preliminary injunction hearing, reiterating the Bishops' moral views and their commitment to absorb the costs associated with the burial ministry without providing religious rituals associated with the burial unless a parent so requested.  She also testified that the Bishops had authority to commit Catholic cemeteries to participate in this program.  On January 27, 2017, the district judge granted the preliminary injunction,

---

[1] Many dioceses in Texas already ran such burial ministries.

[2] Common burial is when the remains of multiple fetuses are collected and buried together in a single grave, which reduces the cost of burial.

3

No. 18-50484

finding that some terms in the regulations were unconstitutionally vague and that the rules impermissibly burdened abortion access. The State appealed.

While the appeal was pending, the Texas legislature moved to enact a law specifying legitimate methods for disposing of fetal remains. Ms. Allmon again testified on behalf of TCCB in favor of these provisions. As part of a larger abortion-related bill—SB8—these provisions were then signed into law in June 2017, set to take effect on February 1, 2018. *See* Tex. S.B. 8, 85th Leg., R.S., § 19(d) (2017).

The plaintiffs immediately moved to enjoin the new law. On January 29, 2018, the district court preliminarily enjoined the provisions of SB8 dealing with fetal remains disposal. The district court set a bench trial date for July 16, 2018 and referred discovery matters to a magistrate judge. On March 19, 2018, the parties stipulated that neither party would produce evidence concerning the cost of compliance with the challenged laws," with the plaintiffs affirming that they "waive[d] any argument . . . that the monetary cost of compliance with the challenged laws contributes to their alleged unconstitutionality." This stipulation allows the plaintiffs to avoid disclosure of any of their financial information. Ms. Allmon is currently identified as a trial witness on behalf of the state and will testify in her capacity as Executive Director of TCCB.[3]

On March 21, 2018, the eve of Holy Week for Christians, a period of intense religious devotional activity, the plaintiffs served TCCB with a third-party subpoena. The subpoena requested, in part, (1) "All Documents concerning EFTR [embryonic and fetal tissue remains], miscarriage, or abortion," (2) "All Documents concerning communications between [TCCB]

---

[3] Ms. Allmon and TCCB participated as a third-party witness voluntarily. However, on June 25, Texas subpoenaed Ms. Allmon to testify at the trial.

No. 18-50484

and current or former employees of DSHS, HHSC, the Office of the Governor of Texas, the Office of the Attorney General of Texas, or any member of the Texas Legislature, since January 1, 2016," and (3) "All documents concerning the Act, the Amendments, or this lawsuit." The subpoena had no retrospective time limitation; made no exception for confidential internal or religious communications; and the return date of the subpoena was 9:00 a.m. on the Tuesday following Easter Sunday.

The Bishops filed their first motion to quash the subpoena and for a protective order on that Monday, April 2, 2018. They contended that the subpoena sought irrelevant evidence, that it violated the free exercise, freedom of speech, freedom of assembly, and freedom of petition guarantees of the First Amendment, that it violated the Religious Freedom Restoration Act ("RFRA"), and that it was unduly burdensome under Fed. Rule Civ. Pro. 45(d). The Bishops' motion was initially denied without prejudice for a failure to meet and confer with the plaintiffs regarding the scope of the subpoena.

Following the denial of TCCB's motion, counsel for TCCB and the plaintiffs met and conferred regarding the subpoena's scope. The plaintiffs agreed to limit their request to the following search terms: SB8, SB 8, Fetal, Fetus, Embryonic, Embryo, Abortion, Aborted, Miscarriage, Unborn, and burial ministry. They also limited the documents requested to those sent or received by Ms. Allmon on or after January 1, 2016.

The Bishops maintained objections to these requests, but nevertheless conducted a search, which returned over 6,000 pages of records. The Bishops ultimately turned over to the plaintiffs 4,321 pages of records,[4] including responsive documents representing communications with third parties such as

---

[4] TCCB estimates that, as of June 10, 2018, it had spent over 100 staff hours responding to the subpoena and accrued over $20,000 in attorney's fees and costs.

No. 18-50484

state officials, Catholic conferences in other states, and Catholic cemeteries participating in the burial ministry.

At a scheduling conference on Friday, June 8, the magistrate judge informed the Bishops that they must file any further motion to quash by 9 a.m. on Monday, June 11, and that the motion would be argued on Wednesday, June 13. Under this tight schedule, the Bishops renewed their objections under the First Amendment, RFRA, and Rule 45(d). At the June 13 hearing, the magistrate judge specified that the parties should limit the focus of their arguments to the free exercise and freedom of association issues.

The plaintiffs explained their need for the remaining documents—namely, the documents' relevance for cross-examination purposes. The plaintiffs offered to withdraw their subpoena if Ms. Allmon withdrew as a voluntary witness. The Bishops produced a privilege log, identifying the documents—emails to or from Ms. Allmon—that it continued to withhold as privileged. The Bishops contended that the subpoena was an intimidation tactic to prevent TCCB from participating as a witness in the litigation. And they argued that the withheld documents were both privileged under the First Amendment and that the plaintiffs had no need for them. After the hearing, Ms. Allmon submitted to a three-hour deposition by the plaintiffs, during which they were able to ask about the facts relevant for trial.

The magistrate judge denied the Bishops' motion to quash later that day. Although the ordinary time to appeal such a denial is 14 days,[5] the district court *sua sponte* ordered the Bishops to file any appeal within approximately 24 hours. The court denied the Bishops' motion for an extension of time to file the appeal. The Bishops complied with the order and filed their appeal by noon on Thursday, June 14. The district court denied the appeal on Sunday, June

---

[5] *See* W.D. Tex. Local Rules, Appendix C, Rule 4(a).

No. 18-50484

17, and ordered the Bishops to produce the remaining documents within 24 hours.

The Bishops appealed, filing a motion for a stay in the district court and an emergency motion for a stay in this court. The district court "generously" granted a 72-hour stay of its order, but this court also granted a stay pending appeal and set an expedited briefing schedule. On June 19, the plaintiffs moved this court to dismiss TCCB's appeal and to vacate the stay. The plaintiffs argued that this court lacked appellate jurisdiction to review the district court's pretrial discovery order. TCCB responded to the motion to dismiss on July 2.

## APPELLATE JURISDICTION

The plaintiffs contend that this court lacks appellate jurisdiction over this "interlocutory" discovery order. TCCB responds that because it is a third party to the litigation, it has no alternative avenue of appeal because having to await the conclusion of litigation by others, whenever and however that may occur, is out of its control and stymies its rights. Thus, while the court's discovery order is not generally "final" within the contemplation of 28 U.S.C. § 1291, TCCB asserts its rights under the collateral order doctrine, which permits appeals of interlocutory decisions (a) that are conclusive, (b) that resolve important questions separate from the merits, and (c) that are effectively unreviewable on appeal from the final judgment. *Mohawk Industries v. Carpenter,* 558 U.S. 100, 106, 130 S. Ct. 599, 605 (2009). For several reasons, we conclude that we do have jurisdiction.

The standards of the collateral order doctrine are met here. There is no dispute that the district court's discovery order was conclusive on TCCB, such that failure to comply with it may result in sanctions against TCCB or its witness. Further, the order resolves important and very novel issues separate from the merits of the litigation over the Texas statute concerning the disposal

7

of fetal tissue remains.  Finally, the plaintiffs do not have an answer to the argument that the consequence of forced discovery here is "effectively unreviewable" on appeal from the final judgment.  Instead, they draw misplaced analogies.

First, they rely heavily, but inappositely, on *Mohawk Industries v. Carpenter*, in which the Supreme Court held that disputes over the discoverability of attorney-client communications are not subject to the collateral order doctrine.  558 U.S. at 114, 130 S. Ct. at 609.  In *Mohawk*, the Court reasoned that as between parties, the appellate court can remedy erroneously ordered discovery by remanding the case for a new trial. *Id.* at 109, 130 S. Ct. at 606-07.  From this standpoint, a discovery order breaching the attorney-client privilege is not "unreviewable on appeal."  This case is distinguishable:  a new trial order can hardly avail a third-party witness who cannot benefit directly from such relief.  *Mohawk* does not speak to the predicament of third parties, whose claims to reasonable protection from the courts have often been met with respect.

The Court also noted the general familiarity of courts with standards governing the attorney-client privilege, a fact that heightens courts' ability to review materials for which privilege is claimed; mitigates the potential for lower court discovery errors; and lessens the novelty of the issues.  *Id.* at 110, 130 S. Ct. at 607.  This case, on the other hand, is practically *sui generis* from the standpoint of the type of discovery sought and the issues raised by TCCB.  As discussed below, neither we nor the plaintiffs nor TCCB have found a case on point.  TCCB's claimed privileges, if applicable, go to the heart of the constitutional protection of religious belief and practice as well as citizens' right to advocate sensitive policies in the public square, a square that embraces both the legislature and the courthouse.  Further, the courts have limited ability to assess the strength of religious groups' claims about their internal

No. 18-50484

deliberations for purposes of monitoring discovery.  Lacking guideposts from the legal arena, any such judicial attempt risks tension with the repeated judicial admonitions that courts stay out of the business of weighing the sincerity of religious beliefs and practices. *See, e.g., Tagore v. United States*, 735 F.3d 324, 328 (5th Cir. 2013).  *Mohawk*, in short, does not prevent application of the collateral order doctrine in this case.

Moreover, on two occasions following *Mohawk*, this court has reaffirmed its precedent holding that interlocutory court orders bearing on First Amendment rights remain subject to appeal pursuant to the collateral order doctrine. *See Marceaux v. Lafayette City-Par. Consol. Gov't*, 731 F.3d 488, 490 (5th Cir. 2013) (citing *Mohawk* in its treatment of the intersection of collateral review and the First Amendment); *In re Hearst Newspapers, L.L.C.*, 641 F.3d 168 (5th Cir. 2011); *see also Henry v. Lake Charles American Press, LLC,* 566 F.3d 164, 180-81 (5th Cir. 2009) (collateral order appeal of denial of anti-SLAPP dismissal permitted, *inter alia,* because of potential impact on First Amendment rights); *United States v. Brown*, 218 F.3d 415, 420-21 (5th Cir. 2000).  These authorities support our appellate jurisdiction when comparable First Amendment claims are at issue.

Having failed to cite our precedents on appealability, the plaintiffs rely instead on two cases from other circuits.[6]  These cases, of course, must yield to our circuit precedent.  In addition, neither *Perry* nor *In re Motor Fuel Sales*

---

[6] In one, the Ninth Circuit, shortly after *Mohawk* was issued, confronted a discovery order covering the internal deliberations of a public interest group that was litigating on behalf of California's Prop 8.  In an abundance of caution, the court rejected use of the collateral order doctrine as a jurisdictional basis, but it proceeded to determine the merits of the case as a mandamus petition. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1156 (9th Cir. 2010). The Tenth Circuit more recently decided that "discovery orders adverse to a claimed First Amendment privilege are not immediately appealable" under the collateral order doctrine. *In re Motor Fuel Temperature Sales Practices Litig.*, 641 F.3d 470, 484 (10th Cir. 2011).

No. 18-50484

*Practices* involved discovery against a third party. *Perry*, in the end, upheld a qualified First Amendment privilege claim, while *In re Motor Fuel Sales Practices* is further distinguishable because the discovery sought information pertaining to potential fraud.

The plaintiffs finally reference a Fifth Circuit decision against a religiously affiliated college in a dispute over the enforceability of a charitable bequest. *See Ambassador College v. Geotzke*, 675 F.2d 662 (5th Cir. 1982). *Ambassador College* is a strange decision on several grounds, but it is not a decision about appellate jurisdiction. This court's jurisdiction was firmly predicated on the district court's final order dismissing the case. We DENY the plaintiffs' motion to dismiss.

## STANDARD OF REVIEW

Because trial is set to commence July 16, we elect to treat this appeal of the motion to quash on the merits. *See Doe v. Office of Refugee Resettlement*, 884 F.3d 269, 271 (5th Cir. 2018). We therefore pretermit the considerations pertinent to a stay pending appeal.

We review the district court's decision on a motion to quash for abuse of discretion. *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 817 (5th Cir. 2004). "The district court's legal conclusions should be reviewed *de novo,* and its factual findings should not be disturbed unless they are clearly erroneous." *Marceaux v. Lafayette City-Par. Consol. Gov't*, 731 F.3d 488, 491 (5th Cir. 2013). A district court's discovery rulings are generally affirmed unless they are "arbitrary or clearly unreasonable." *United States v. Butler*, 429 F.3d 140, 148 (5th Cir. 2005). However, "in cases raising First Amendment issues[,] . . . an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression." *Marceaux*, 731 F.3d at 491-92 (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*,

No. 18-50484

466 U.S. 485, 499, 104 S. Ct. 1940, 1958 (1984) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 285, 84 S. Ct. 710, 729 (1964))).

## DISCUSSION

I. The district court's order assumed, essentially, that this discovery dispute is like a garden variety dispute over the necessity of discovery from a corporate representative designated as a trial witness. Thus, the court rather hastily concluded that because the withheld internal communications (to which Ms. Allmon was privy) fell within the scope of the parties' agreed search terms, they were relevant and necessary to preparing the plaintiffs' cross-examination. The court thus overruled TCCB's objections based on relevance, undue burden, and necessity under Fed. Rule Civ. Pro. 45(d)(3)(A).

The court held that TCCB waived any privilege claim based on RFRA by not having timely raised that issue in proceedings before the magistrate judge.

Addressing TCCB's claims of First Amendment privilege, the court first rejected free exercise and establishment clause arguments because any such privilege claim is necessarily qualified, not categorical. The court also concluded, based on the magistrate judge's review of a selected portion of the internal communications, that "[t]here has been no showing Plaintiffs' discovery request infringes on TCCB's right to control its own affairs or interferes with matters of church governance, faith, or doctrine."

The court found TCCB's privilege claim based on the First Amendment right of association a closer, albeit unavailing, call. The court acknowledged "a limited [constitutional] right to associate with others for the common advancement of beliefs and ideas concerning political, economic, religious or cultural matters." The court's standard for the limited privilege accepted that "[i]nfringements on that right may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational

11

No. 18-50484

freedoms." *Perry*, 591 F.3d at 1159 (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623, 104 S. Ct 3244, 3252 (1984)). The court assumed that discovery requests in court meet the compelling interest test. It then held that although TCCB might have made a prima facie showing that enforcing production of the internal communications would chill the exercise of the body's rights (principally by discouraging the use of emails for internal conversation within TCCB), such a showing did not outweigh the plaintiffs' substantial interest in obtaining production. This weighing balanced the previous findings that the internal communications bear only on "facts" in issue at trial, against the relative "weakness" of TCCB's invasion of privacy compared with cases involving the deterrence of membership or advocacy.

II. With due respect to the district court, its analysis was incorrectly dismissive of the seriousness of the issues raised by TCCB. It is no accident that we have found no case directly on point on the issue of compelling discovery of internal communications within a religious body concerning its activities in the public square to advance and protect its position on serious moral or political issues.[7] It is no accident that several religiously affiliated organizations have filed amicus briefs in support of TCCB's claim.[8]

---

[7] *Williams v. Parker,* 843 F.3d 617, 622-23 (5th Cir. 2016) is not applicable, because there the plaintiffs made only a "bare assertion" that their First Amendment rights had been violated, nor did they "explain how, precisely, their rights were curtailed."

[8] *See* Brief for the Jewish Coalition for Religious Liberty as Amici Curiae Supporting Appellants; Brief for the Ethics & Religious Liberty Commission of the Southern Baptist Convention and National Association of Evangelicals as Amici Curiae Supporting Appellants; Brief for the United States Conference of Catholic Bishops *et al.* as Amici Curiae Supporting Appellants.

No doubt, the tension about the religious claims that spawned the amicus briefs was heightened by two strange circumstances suggesting at least religious insensitivity: (a) that the plaintiffs chose to time their original subpoena, and the return date, to coincide with Holy Week, and (b) that the district court chose to issue its decision rejecting the motion to quash on a Sunday morning when TCCB's members and employees were almost surely in church. No obvious time constraint justified either of these choices.

12

No. 18-50484

The difficulties we perceive with the court's analysis of the First Amendment claims are as follows. The court erred in determining that TCCB waived its claim of protection under RFRA. The court's analysis of the free exercise and establishment clause claims begs the fundamental, novel issues presented under these circumstances. The court's rejection of the free speech, association, and petition claims too narrowly construes the nature of chilling effects on those rights while overbroadly interpreting the importance to the plaintiffs of the discovery sought here.

Together, the dearth of guiding case law and the importance of context in any resolution of these issues counsel strongly in favor of the doctrine of constitutional avoidance. *See Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 346-47, 56 S. Ct. 466, 482-83 (1936) (Brandeis, J., concurring); *Hersh v. U.S. ex rel. Mukasey,* 553 F.3d 743, 753-54 (5th Cir. 2008). Because a non-constitutional argument, founded on Rule 45(d)'s protection of parties subject to subpoenas, is here decisive, we need only sketch the problems inherent in the district court's insensitive constitutional approach.[9]

To begin, Rule 45(d) states that a district court "must" quash a subpoena when it accepts a privilege claim, where "no exception or waiver applies." TCCB did not "waive" its argument that RFRA should have applied to the discovery request. The issue was clearly stated in TCCB's motion to quash. When the parties appeared before the magistrate judge, however, he advised

---

[9] Like the district court, the dissent would pigeonhole this dispute as simply another discovery tiff that is resolved simply by an *in camera* look at the documents. This truncation can only occur, however, based on the assumption, stated by the dissent, that the scope of any Free Exercise privilege here is limited to judicial intrusions on church leadership or internal management. The dissent wholly overlooks the RFRA argument made by TCCB. And the dissent again assumes its Freedom of Association conclusion—that no associational privilege exists—by arbitrarily cabining the scope of "deliberative discussions" within TCCB. And by the way, this opinion only sets forth, *but does not rule on*, any of these substantial, novel claims. Instead, this opinion holds that the district court misapplied Rule 45(d), inflicted undue burden on TCCB, and in so doing abused its discretion.

13

No. 18-50484

them to focus on the First Amendment contentions.  It cannot be waiver for TCCB to have acquiesced in the judge's directions at oral argument on the motion to quash.

Had the district court considered RFRA, it would have confronted authority that holds the law applicable to court-ordered discovery, *i.e.*, a grand jury subpoena.  The Third Circuit has held, consistent with the coverage of RFRA itself, that a grand jury subpoena can implicate free exercise claims. *See In re Grand Jury Empaneling*, 171 F.3d 826, 835 (3d Cir. 1999) ("Lest there be any confusion, we reiterate: in deciding whether to enforce a grand jury subpoena over a RFRA objection, the district court must satisfy itself that the witness's testimony is necessary to serve a compelling state interest.").  With that support, a RFRA claim depends on three conditions:  a sincere claim of religious belief; a "substantial burden" that will be imposed on the exercise of that belief by particular government action; and whether the government shows a "compelling need" for the imposition and utilizes "least restrictive means" to achieve its goal.  *See Tagore*, 735 F.3d at 330.

No one challenges the sincerity of TCCB's claim that the Church feels morally impelled to support humane (and "human") treatment of fetal remains. The "substantial burden" here is from compelling TCCB to reveal wholly internal communications concerning its approach to this issue and participation in the issues surrounding the statute.  This court has previously discussed handling issues about sincere religious belief and substantial burden with "a light touch." *Moussazadeh v. Texas Dep't of Criminal Justice*, 703 F.3d 781, 792 (5th Cir. 2012), *as corrected* (Feb. 20, 2013).  Moreover, the burden here comes from compelling TCCB to produce internal communications as the price for providing a witness in support of this controversial law, and subjecting TCCB to a threat of sanctions, ranging from monetary to striking the witness to contempt, if it fails to comply.

14

No. 18-50484

As for the government's (*i.e.*, the court's or litigant's using the court) compelling need and least restrictive means, they are not satisfied merely because the Federal Rules ordinarily authorize broad discovery. The plaintiffs have not shown how Ms. Allmon's existing testimony failed adequately to reveal TCCB's position or exactly what they sought from the 298 emails that have not been turned over. Insofar as those communications may reveal internal deliberations about the implications of TCCB's position under canon law and Catholic doctrine, there is no compelling need whatsoever.

The plaintiffs and district court allege, however, that only "facts" relevant to this litigation from the internal communications are being subjected to discovery. But this decision begs two questions about the "compelling" nature of the "need." First, on what basis is the judiciary institutionally competent to discern which communications merely bear on the "facts" and which communications interfere with a religious body's free exercise? The district court assumed such competence exists. *But see, e.g.*, *Moussazadeh,* 703 F.3d at 792 (judiciary should take a "light touch" with matters of religious belief and practice); *Tagore*, 735 F.3d at 328 (noting that "claims of sincere religious belief in a particular practice have been accepted on little more than the plaintiff's credible assertions"); Brief for the Jewish Coalition for Religious Liberty as Amici Curiae Supporting Appellants at 14-18 (explaining how regulations concerning kosher standards and processes implicate nuanced and controversial doctrinal views despite superficially objective determinations). The second question is whether the judiciary's actual performance of any such sorting task itself invades the religious body's integrity. Courts have generally foresworn involvement in disputes internal to religious groups. *See Kedroff v. St. Nicholas Cathedral of Russ. Orthodox*

No. 18-50484

*Church in N. Am.*, 344 U.S. 94, 116, 73 S. Ct. 143, 154-55 (1952); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 (5th Cir. 2012).[10]

Finally, the least restrictive means seem to have been employed already. Ms. Allmon testified at the administrative hearing, the first preliminary injunction hearing, and in deposition only a few weeks ago, and she filed affidavits. TCCB voluntarily produced thousands of pages of documents reflecting external communications, at substantial cost in personnel time and attorney's fees.

We do not resolve these difficult questions, but no matter how you look at this RFRA claim, it was reasonable for TCCB to seek refuge under the federal law.

As for the free speech, free association, and petition claims under the First Amendment, the district court failed to afford sufficient scope to rights that should protect the inner workings of TCCB when it engages in activity in the public square. The district court seemed to limit the associational rights to the "chilling" of membership and tangible harassment. In *Perry*, however, the Ninth Circuit squarely considered these rights and exempted from discovery the internal communications of a citizens' group that was supporting California Prop 8 (opposing gay marriage). 591 F.3d at 1145. The court understood that communications within such a group must be permitted to be broad, uninhibited, and fearless, and that protecting such deliberations is a seminal aspect of the freedom to associate.

*Perry*, to be sure, recognized a qualified privilege based on Supreme Court precedent. *See Perry,* 591 F.3d at 1155-56; *Flanagan v. United States*,

---

[10] As in the above discussion, the dissent's contention that TCCB forfeited its constitutional claims by voluntarily submitting documents for *in camera* inspection begs the questions about institutional competence and intrusion on internal religious governance. It is a clever argument that neither the district court nor the plaintiffs suggested.

No. 18-50484

465 U.S. 259, 267-68 104 S. Ct. 1051, 1055-57 (1984); *Gibson v. Fla. Legislative Investigation Comm.,* 372 U.S. 539, 557 83 S. Ct. 889, 899 (1963). That balancing approach reconciles *Perry* with cases like *Ambassador College v. Geotzke,*[11] which was a fraud case against a religious college, and *United States v. Holmes,*[12] which held religious groups may be subject to government inquiries to maintain tax exempt status.

Contrary to the district court, however, the explanation of how TCCB's activities—and the activities of any other religious institution forced to endure similar discovery—are "chilled" by enforcement of this subpoena seems self-evident. As TCCB describes, in addition to the significant cost of complying with the original subpoena (100 work hours and over $20,000 in attorney's fees), TCCB has delayed and missed ministry opportunities; suffered in relationships with other Catholic ministries whose communications it was forced to disclose; was required to cancel internal ministry reports and training materials; TCCB bishops and staff were discouraged from engaging in other public policy activities; and Texas Catholic cemeteries were deterred from participating in the fetal remains registry. TCCB's ability to conduct frank internal dialogue and deliberations was undermined, and not only because enforcement of the subpoena inhibits the further use of email communications. Why the district court found "chilling" but not "severe" its discovery order's impact on TCCB's internal email communications, in this era of instant group communication, is hard to fathom. Even more disturbing, this discovery order forces TCCB to turn over *to a public policy opponent* its internal communications, setting a precedent that may be replicated in litigation anywhere.

---

[11] 675 F.2d 662, 664 (5th Cir. 1982).

[12] 614 F.2d 985, 989-90 (5th Cir. 1980).

No. 18-50484

These burdens flow naturally into TCCB's arguments for a privilege based on the structural protection afforded religious organizations and practice under the Constitution.  "[I]t is easy to forget that the autonomy of religious groups . . . has often served as a shield against oppressive civil laws.  To safeguard this crucial autonomy, we have long recognized that the Religion Clauses protect a private sphere within which religious bodies are free to govern themselves in accordance with their own beliefs."  *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.,* 565 U.S. 171, 199-200, 132 S. Ct. 694, 712 (Alito, J., concurring) (citing *Kedroff,* 344 U.S. at 116, 73 S. Ct. at 154-55).  Both free exercise and establishment clause problems seem inherent in the court's discovery order. That internal communications are to be revealed not only interferes with TCCB's decision-making processes on a matter of intense doctrinal concern but also exposes those processes to an opponent and will induce similar ongoing intrusions against religious bodies' self-government.  Moreover, courts' involvement in attempting to parse the internal communications and discern which are "facts" and which are "religious" seems tantamount to judicially creating an ecclesiastical test in violation of the Establishment Clause.  The Supreme Court has noted that "it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious. . . . [A]nd an organization might understandably be concerned that a judge would not understand its religious tenets and sense of mission." *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos,* 483 U.S. 327, 336, 107 S. Ct. 2862, 2868 (1987). The amici here uniformly decry the potential for misuse of the district court's narrowly focused balancing test that denigrated the impacts of judicial discovery procedures on their internal communications, while potentially empowering certain interest groups to harass, impose disastrous costs on, and uniquely

18

No. 18-50484

burden religious organizations. Yet the claim of religious organizations to maintain their internal organizational autonomy intact from ordinary discovery should be at least as secure as the protection constitutionally afforded other associations. Supreme Court decisions have protected religious organizations' internal deliberations and decision-making in numerous ways. *See*, *e.g.*, *Hosanna-Tabor*, 565 U.S. at 199-200, 132 S. Ct. at 712. Although none have spoken directly to discovery orders in litigation, the importance of securing religious groups' institutional autonomy, while allowing them to enter the public square, cannot be understated and reflects consistent prior case law.

Another way to look at the scope of a qualified First Amendment privilege is through the lens of hypothetical involvement by an abortion rights organization in this litigation. Suppose the plaintiffs offered testimony of a representative of Abortion Rights Unlimited ("ARU") (a fictitious group) to testify about the national status of fetal remains statutes and their general impact on abortion providers. Suppose the State of Texas issued a subpoena for any/all documents representing communications among the Board of ARU and the witness concerning those matters of discussion. Or the State agreed to withdraw its subpoena if ARU withheld offering its witness testimony. As a third-party witness, under the *Perry* balancing test, would the court subject ARU to such discovery? It seems the advocacy group would have a strong argument against forced disclosure of its internal communications as the price for its testimony on a matter of intense concern to the public and its members.

Assuming the seriousness of the chilling effects on their First Amendment rights, it is hard to see how the plaintiffs have borne their burden under *Perry* to show a substantial need for the documents that outweighs the intrusion into TCCB's constitutional rights. As noted in the next section, TCCB has already cooperated extensively in discovery in a way that minimizes any adverse impact on the plaintiffs' ability to cross-examine Ms. Allmon.

No. 18-50484

We need not and do not finally resolve whether the order enforcing discovery of the internal emails violated TCCB's constitutional rights, but the issues raised above should have given pause to the district court before it waved away TCCB's privilege claims.

III. The rule of constitutional avoidance prevents courts from issuing unnecessary and potentially overbroad or misleading rulings on constitutional issues. That rule forcefully counsels restraint in this case, where the issues are both novel and far-reaching and time is woefully short for thorough consideration.

We turn instead to applications of Rule 45(d), which states that a court "must" quash a subpoena to avoid "subject[ing] a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii)-(iv). The district court applied the balancing test described by this court in *Wiwa*. *See* 392 F.3d at 818-19 (listing balancing factors). *Wiwa* explains that "if the person to whom the document request is made is a non-party, the court may also consider the expense and inconvenience to the non-party." 392 F.3d at 818. The court here concluded that no "undue burden" existed after eliminating the privilege claims and simply considering whether internal TCCB communications could provide "relevant facts" that the plaintiffs "need" to cross-examine Ms. Allmon about the "actual status" of TCCB's commitment to provide cost-free interment services. TCCB contends, however, that the subpoena inflicts an undue burden in compelling the organization to disclose its internal communications when it has already been subjected to substantial discovery demands and raises substantial claims to constitutional and RFRA protection. Bearing in mind that TCCB is a third-party witness, we consider the strength of the court's relevancy and need determinations, and we conclude that the court's decision was an abuse of discretion.

20

No. 18-50484

First, the plaintiffs' "need" to obtain these additional emails is questionable at best. TCCB has already produced over 4,000 pages of responsive discovery documents, and Ms. Allmon has testified thrice and furnished affidavits, all of which can be used in her cross-examination. The plaintiffs' brief to this court discusses Ms. Allmon's prior testimony in support of their discovery request, quoting it at length for three pages, and calling it "vague," "contradictory" of her prior testimony, or downright inaccurate. Her recent deposition is 125 pages long. Further document discovery of any kind would, without further explanation, be cumulative. The plaintiffs have furnished no such further explanation, and the opinions of the magistrate and district judges do not hint that important additional facts, not yet divulged by TCCB, are revealed in the internal emails. In sum, the groundwork for cross-examination appears to be laid, especially for purposes of a bench trial.

Perhaps most telling, as this appeal is being decided, the plaintiffs have moved the district court to strike Ms. Allmon's testimony. (If granted, the motion would effectively prevent TCCB from airing its position in support of the statute.) In doing so, the plaintiffs characterize Ms. Allmon's testimony as "cumulative and a waste of trial time." The more "cumulative," obviously, the less is the "need" for and "relevance" of cumulative document discovery.

Concerning relevance, the plaintiffs' burden at trial is to show that the statute poses an "undue burden" on women's access to abortion services. To do so, they will probably try to demonstrate that many women clients do not care what happens to fetal remains or would have objections to burial in Catholic cemeteries; that TCCB's offer of free burials is vague, not concrete in detail, and has been watered down as the litigation progressed; that complying with the women's desires and finding the appropriate burial grounds would pose significant logistical problems and hardship for the plaintiffs' provision of abortion services; and that other suitable burial locations are unavailable. To

21

No. 18-50484

the extent the plaintiffs seek to diminish the probative value of TCCB's offer, they have already gotten access to such ammunition. Catholic cemeteries, moreover, are but a small proportion of those statewide. Thus, TCCB's participation in facilitating the law cannot be the sole test of "burden" avoided or "burden" imposed for either party.

The small or non-existent incremental "need" for and "relevance" of this discovery alone impose a burden on TCCB, if it must produce documents unnecessary to the litigation. There is an additional burden on TCCB as a third party in this morally and politically consequential case: TCCB has been challenged by the plaintiffs to either produce internal communication documents or withdraw its witness. This looks like an act of intimidation. The demand places on TCCB the "Hobson's choice" of retreating from the public square or defending its position while creating a precedent (for the first time) that may open its internal deliberations to public scrutiny, or at least, ill-informed judicial scrutiny. This burden on TCCB's constitutional right to advocate in the public square cannot be ignored, nor can the burdens TCCB has shown were created by this intrusive discovery request: relations with other parties in the faith impaired, internal modes of discussion upended, and participation by some Catholic cemeteries deterred.

Finally, rather than reject all of TCCB's privilege claims, the district court should have acknowledged their novelty and far-reaching implications and interpreted the appropriate scope of document production under Rule 45(d) in light of the principle of constitutional avoidance.

In sum, the district court discounted the burdens of production on TCCB and failed to require more than a minimal, if any, rationale for discovery of TCCB's internal communications. The court was too quick to reject TCCB's privilege claims. By acting in unnecessary haste, the court deprived TCCB of

No. 18-50484

a fair opportunity to make its case for quashing the discovery. For these reasons, the district court erred and abused its discretion under Rule 45(d).

## CONCLUSION

The court's order denying the motion to quash and compelling discovery of internal communications within TCCB is **REVERSED**. The plaintiffs' motion to dismiss the appeal and vacate the stay is **DENIED**.

No. 18-50484

JAMES C. HO, Circuit Judge, concurring:

It is hard to imagine a better example of how far we have strayed from the text and original understanding of the Constitution than this case.

The First Amendment expressly guarantees the free exercise of religion—including the right of the Bishops to express their profound objection to the moral tragedy of abortion, by offering free burial services for fetal remains. By contrast, nothing in the text or original understanding of the Constitution prevents a state from requiring the proper burial of fetal remains.

But from the proceedings below, you would think the opposite were true.

Those proceedings are chronicled in Judge Jones's comprehensive opinion for the Court. And they are troubling. They leave this Court to wonder why the district court saw the need to impose a 24-hour mandate on the Bishops on a Sunday (Father's Day, no less), if not in an effort to either evade appellate review—or tax the Bishops and their counsel for seeking review. They leave this Court to wonder if this discovery is sought, *inter alia*, to retaliate against people of faith for not only believing in the sanctity of life—but also for wanting to do something about it. *See, e.g.*, *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719 (2018).

I join Judge Jones's excellent opinion, with regret that the relief we grant today is even necessary. *See Stormans, Inc. v. Wiesman*, 136 S. Ct. 2433 (2016) (Alito, J., joined by Roberts, C.J., and Thomas, J., dissenting from denial of certiorari) ("This case is an ominous sign. . . . If this is a sign of how religious liberty claims will be treated in the years ahead, those who value religious freedom have cause for great concern.").

24

No. 18-50484

GREGG COSTA, Circuit Judge, dissenting:

The first step an appellate court is supposed to take in a case is reviewing the same materials the trial court considered. Only after that can it decide if that judge erred. In a stark departure from that norm, the majority opinion finds that the district court didn't just err but abused its discretion in balancing discovery factors without looking at the most critical part of the trial court record: the *in camera* production of documents that would show whether the First Amendment concerns that today's decision can only speculate about actually exist. Two judges—the magistrate and district judge—reviewed those documents. The magistrate concluded, and the district court agreed, that "the emails between Ms. Allmon and staff members of the TCCB have no religious focus, do not discuss church doctrine or governance, and are more or less routine discussions of the burial services at issue here." In reversing the order to produce based on a categorical privilege that doesn't even allow for *in camera* review, the majority opinion offends the principle of constitutional avoidance it purports to invoke. True avoidance of difficult First Amendment questions would be to not opine on them when they are not properly before the court. *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 408 (1995) (O'Connor, J., dissenting) (explaining that principles of appellate waiver "rest[] firmly upon a limited view of our judicial power" (citing *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.)). That is true for the claim of categorical privilege that has been forfeited if not waived in light of the Texas Catholic Conference of Bishops' submission to the trial court of documents for *in camera* production that it now argues even a court may not review. The result is an opinion filled with abstract propositions of First Amendment law—some of which I agree with—but that is divorced from the reality of this case. Before declaring that the judges who reviewed the records abused their discretion in

No. 18-50484

concluding they did not pose the claimed harms, the appellate court should look at them.

## I.

The rule requiring appellate preservation of error is not the only limit on our authority that the majority opinion overrides. It also engages in an unprecedented act by resolving a discovery dispute at the interlocutory stage. The court recognizes the ordinary rule that discovery disputes are not collateral orders subject to interlocutory appeal, but concludes that gives way when a First Amendment claim is at stake. If actually limited to that type of constitutional claim, our jurisdiction would be a close question. Although we have held that other types of rulings bearing on First Amendment rights are appealable collateral orders, *see, e.g., Henry v. Lake Charles Am. Press, LLC*, 566 F.3d 164, 180–81 (5th Cir. 2009) (order denying anti-SLAPP dismissal under Louisiana statute); *In re Hearst Newspapers, L.L.C.*, 641 F.3d 168, 172 (5th Cir. 2011) (order denying journalists access to a sentencing hearing), we have never confronted the tension between that principle and the general rule that discovery orders are not collateral ones, *Mohawk Indus. v. Carpenter*, 558 U.S. 100, 108 (2009). The longstanding rule against such interlocutory review of discovery orders serves important interests: "Routine appeal from disputed discovery orders would disrupt the orderly progress of the litigation, swamp the courts of appeals, and substantially reduce the district court's ability to control the discovery process." 5B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3914.23 (2d ed. 1992); *see also Mohawk*, 558 U.S. at 112 ("Permitting parties to undertake successive, piecemeal appeals of all adverse attorney-client rulings would unduly delay the resolution of district court litigation and needlessly burden the Courts of Appeals.")

One circuit confronting the clash between the different rules governing interlocutory review of First Amendment claims and discovery orders

No. 18-50484

concluded that the collateral order doctrine does not allow the immediate appeal of "discovery orders adverse to a claimed First Amendment privilege." *In re Motor Fuel Temperature Sales Practices Litig.*, 641 F.3d 470, 484 (10th Cir. 2011). Another recognized the difficulty of the question, so avoided it and decided the First Amendment claim in the mandamus context. *Perry v. Schwarzenegger*, 591 F.3d 1147, 1154–57 (9th Cir. 2010). That is another reason this is such a tough question. The majority opinion assumes that the collateral order doctrine is the only route to stopping a production before it happens. But a mandamus petition, which is just as available to a third party as to a litigant, is the typical way to protect a privilege when its piercing will cause irreparable harm. *See In re Itron*, 883 F.3d 553, 567–68 (5th Cir. 2018); *In re Avantel*, 343 F.3d 311, 317 (5th Cir. 2003) ("Mandamus is an appropriate means of relief if a district court errs in ordering the discovery of privileged documents, as such an order would not be reviewable on appeal."); *see also Mohawk*, 558 U.S. at 110 (noting that there are "several potential avenues of review apart from the collateral order appeal, including mandamus,' for a "novel privilege ruling"). Tellingly, that is the avenue for appellate relief the Conference originally planned to pursue. At the hearing on the privilege claim, its counsel asked the court "if you rule against us, that you give us time to mandamus the opinion." But prevailing in the mandamus context requires showing a "clear and indisputable" right to relief, *Itron*, 883 F.3d at 567 (quoting *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380–81 (2004)), which is difficult for any claim and especially a novel one.

Even if the reasoning in *Henry* supports recognizing the collateral order doctrine and not just mandamus as a path for interlocutory review of a First Amendment privilege claim, the problem is that the majority opinion soon becomes disconnected from this narrow jurisdictional hook. It proceeds to discuss whether the discovery request violates a federal statute (the Religious

27

No. 18-50484

Freedom Restoration Act), and its ultimate ruling is that the district court abused its discretion in balancing the factors under Federal Rule of Civil Procedure 45, the type of judgment call weighing the benefits and burdens of discovery that trial judges make on a daily basis. The majority opinion resorts to the discovery rule under the laudable goal of avoiding constitutional problems. But that doctrine requires a "substantial" constitutional concern. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 250 (2012); *see also United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994) (avoiding the constitutional issue because the competing interpretation would "raise serious constitutional doubts"). Much like we should not depart from the most obvious construction of a statute unless that interpretation would *likely* result in the law being unconstitutional, we should not allow piecemeal review of a discovery order unless that ruling raises a substantial constitutional concern. [1]

II.

A.

The Conference's privilege claim does not present a substantial First Amendment concern for the reason mentioned at the outset: it did not argue in the trial court that the First Amendment barred *in camera* inspection of its records, so it cannot do so now. And our failure to review the documents means we have no basis for disagreeing with the district court's assessment that they are constitutionally benign.

---

[1] These are two separate "constitutional avoidance" principles. The one that favors reading a statute in a manner (so long as it's reasonable) that avoids constitutional difficulties is a canon of construction. The one applied in this case supports first addressing nonconstitutional grounds for a judicial decision. *See* SCALIA & GARNER, *supra*, at 251. But both rules should apply only when the constitutional claim is a difficult one, lest they override other important principles like giving statutes their ordinary meaning or, in this case, not allowing interlocutory review of applications of the federal discovery rules.

No. 18-50484

The Conference provided the documents at the discovery hearing. They are a representative sample it selected of the documents classified as privileged. Counsel for the Conference told the court, "Your Honor, I would like to submit to you the in-camera documents, examples." Neither that statement nor anything else said at the hearing hints at any discomfort with the *in camera* procedure and certainly no official objection. Counsel even helped facilitate the court's review by breaking down the privileged documents "into three types of internal communication."[2] The failure to object to the *in camera* inspection certainly forfeits an appellate challenge to it, and the affirmative act of producing the documents likely amounts to full-scale waiver. *See Freytag v. C.I.R.*, 501 U.S. 868, 895 n.2 (1991) (Scalia, J., concurring) (discussing differences between forfeiture and waiver, the primary one being that the latter requires "intentional relinquishment or abandonment of a known right or privilege").

Even beyond those obstacles to our review, this may be a case of judicial estoppel. Arguing now that the inspection was improper after the Conference willfully provided the documents to the trial court in the hope it would find them privileged has the flavor of the heads-I-win-tails-you-lose positioning that estoppel prohibits. *See generally New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001). If the *in camera* review had resulted in the district court's finding the documents privileged, the Conference would have prevailed. It did not, so the Conference now argues "'[t]he very process of inquiry' into the Bishops' deliberations 'impinge[s] on rights guaranteed by the Religion Clauses.'"

---

[2] Even if there were some suggestion that the Conference was uncomfortable with the *in camera* review and agreed to it only under compulsion, this appeal shows it knows exactly how to respond when ordered to do something it does not want to do: seek an emergency stay and file an interlocutory appeal.

No. 18-50484

But at a minimum the production resulted in forfeiture, a bedrock limit on appellate review that applies no matter how weighty the interest asserted. Forfeiture, for example, routinely bars the assertion of protections found in the Bill of Rights in the criminal and civil rights cases that dominate our docket. And forfeiture in the context of an objection to *in camera* privilege review is justified by even more than the interests in restraint, full development of the record, and respect for the trial court that ordinary application of the rule of appellate preservation promotes. It means that any harm resulting from a judge's inspection cannot be undone. With two judges having already reviewed the documents, that cat is out of the bag.[3]

We thus must evaluate the strength of the Conference's privilege claim not based on hypotheticals we can create but in light of the real world documents at issue. And, given that it had no objection to the *in camera* procedure, the Conference had every incentive to provide the court with examples that presented the best case for privilege. Indeed, plaintiff noted at the hearing that it would not agree that the documents produced were a representative sample because it did not want a court finding of protection for

---

[3] The forfeiture means we cannot consider the institutional ability of judges to review matters of First Amendment privilege. It is worth noting, however, that judges review privilege in all sorts of sensitive areas that unlike attorney-client privilege are not ones in which lawyers have particular expertise. *United States v. Nixon*, 418 U.S. 683 (1974) (finding that "very important interest in confidentiality of Presidential communications" is not "significantly diminished" by allowing *in camera* inspection of documents); *Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1051 (8th Cir. 2007) (discussing the magistrate's *in camera* review of unredacted FBI files potentially subject to confidential informant privilege); *Stein v. Dep't of Justice & Fed. Bureau of Investigation*, 662 F.2d 1245, 1254 (7th Cir. 1981) (basing a conclusion that the FBI may continue to withhold classified national security documents on *in camera* review of material). This includes First Amendment claims involving reporters' privilege. *United States v. Cuthbertson*, 630 F.2d 139, 149 (3d Cir. 1980) (affirming contempt citation for party that failed to produce documents for *in camera* inspection after asserting journalists' First Amendment privilege). And judges conducting an *in camera* review do not have to guess in a vacuum at why the documents might be privileged; the party asserting that claim has the opportunity to explain it.

No. 18-50484

what were likely the best documents for a privilege claim to automatically protect other documents.

## B.

The trial court's undisturbed finding that the documents selected by the Conference did not "have [a] religious focus" or "discuss church doctrine or governance" means there is no close constitutional question. I'll start with the Religion Clauses. Free exercise presents an uphill climb given the prevailing, if controversial, view that enforcing neutral laws of general applicability does not offend the Free Exercise Clause. *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 879, 885 (1990). So even neutral laws that criminalize or otherwise punish a religious practice do not offend free exercise. *Id.* The district court's application of Federal Rule of Civil Procedure 45, which is the state action here, does not prohibit any religious practice. It seeks documents that the Conference contends discuss religious practices and beliefs. But it cannot be reasonably argued that subjecting the Conference to the same rules of civil procedure that everyone else faces in federal court is aimed at inhibiting the free exercise of religion.

Nor does the order of production amount to court involvement in church leadership decisions, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 194–95 (2012), or the internal management of a religious organization, *Lemon v. Kurtzman,* 403 U.S. 602, 607 (1971). Whether this line of cases is treated as a burden on the free exercise of religion or as state entanglement with the church under the Establishment Clause,[4]

---

[4] The Conference treats these cases primarily as ones arising under the Establishment Clause. The caselaw is admittedly confusing on which First Amendment clause is the main source of these decisions. A leading scholar argues that the appropriate way to view them is as free exercise cases addressing burdens on church autonomy. *See* Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and Right to Chuch Autonomy*, 81 COLUM. L. REV. 1373 (1981).

No. 18-50484

documents that "do not discuss church doctrine or governance" do not come close to the concerns these cases have addressed. What is more, a discovery order is not like the court orders typically involved in this line of cases—such as those requiring a religious organization to engage or not engage in any religious practice, make an employment decision, or alter its educational curriculum.

That leaves the right of association which can fit this context of an order requiring the production of documents. The district court thus correctly viewed this as the Conference's strongest claim. It is not, of course, the type of associational right at issue in the leading case recognizing this aspect of the First Amendment, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958), which involved the disclosure of members of a group to the state with all its power to retaliate against those expressing unpopular views. But courts have also recognized a right to be protected from "other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010). This is where the majority opinion's hypothetical concerns are most plausible. But the district court had the benefit of looking to see if the potential threat to associational activity was realized. It found that it wasn't, and we have no basis for disturbing that finding.

Because the discovery order does not raise a close constitutional question, our jurisdiction does not extend to objections based on federal statutes or rules of procedure. The majority opinion is correct that I "wholly overlook[]" the RFRA argument. Faithful application of limits on our ability

No. 18-50484

to hear piecemeal appeals of discovery rules requires that.[5]  The majority opinion overlooks that important limitation on our appellate jurisdiction.  Its eagerness to address all the issues raised by the Conference and supporting amici also resulted in its neglect of the rule that we do not consider claims that have been forfeited or waived.  Adherence to these ordinary limits on our authority was particularly warranted for an expedited appeal that did not allow for oral argument.  These rules limiting our authority do not mean that a court will never decide the issue that is not properly preserved.  More often they ensure that when a court finally does confront the question, it does so with a full development of the record and law that promotes sound decisionmaking.  *See Lebron*, 513 U.S. at 408 (O'Connor, J., dissenting) (recognizing that "patience in the judicial resolution of conflicts" leads to better decisions (quoting John Paul Stevens*, Some Thoughts on Judicial Restraint*, 66 JUDICATURE 177, 183 (1982)).

For these reasons, I would affirm the district court.

III.

Two additional observations are in order.  The majority opinion ascribes "at least religious insensitivity" if not worse, as well as "intimidation" tactics, to plaintiff's counsel.  From this vantage point, it may seem like the stipulation that the plaintiff will not challenge the cost of the burial services as an undue burden means there is no role for the Conference at trial (though the reason trial judges are given considerable discretion in discovery matters is that they know the ins-and-outs of a case having lived with it, sometimes for years).  But the plaintiff is not the reason the Conference is involved in this case.  Indeed, the stipulation shows plaintiff's willingness to avoid any issues involving the

---

[5] That does not mean there is no outlet for the Conference to raise important statutory concerns.  As mentioned, a petition for mandamus relief was a possibility assuming the RFRA issue was preserved.

No. 18-50484

Conference. But the Conference, as is its right, voluntarily appeared at earlier stages of this litigation, and Texas has subpoenaed its witness for trial. What the majority opinion views as an improper threat—that the discovery request will go away if the Conference witness doesn't appear—is just an obvious point that if there is no witness, then there is no need to request documents that might impeach her testimony. More fundamentally, even if this case presents yet another example of the discovery overkill that plagues civil litigation, there is no basis to view the discovery request (the scope of which the plaintiff and Conference worked to greatly narrow) and its timing as anything more than lawyers trying to fulfill their duty of zealous advocacy. The unusual behavior would be if a party did not seek documents from a witness it plans to cross examine at trial.

Even more troubling are the potshots directed at the district court, and the concurring opinion then piles on. That the pecking order of the system allows appellate judges' view of the law to ultimately prevail should be satisfaction enough for us. While vigorous disagreement about the law is part of the judicial function, there is no need to go beyond the identification of legal error by questioning the motives of our district court brethren. That is especially true when the legal issue is one that the majority opinion concedes is novel, and when the ill motives are pure conjecture. What is one of the sins of the trial court according to the majority opinion? Working and issuing orders on a weekend.

Our district court colleagues deserve most of the credit for the federal judiciary being the shining light that it is. They work under greater docket pressures, with greater time constraints, yet with fewer resources. And unlike appellate judges on a divided panel who can trade barbs back and forth, a district judge has no opportunity to respond to personal attacks in an appellate opinion. They deserve our respect and collegiality even when, or especially

34

No. 18-50484

when, they err as we all do at times.  Among the exemplary group of trial judges who serve our circuit, the one handling this case stands out: with over three decades of service, he is now essentially working for free as a senior judge, and volunteering to travel thousands of miles outside the district of his appointment to help with the heavy docket in the Western District of Texas. Speculating that malice is behind his decisions seeking to expedite a high profile case with a rapidly approaching trial date is not the award he is due.